[Crim. No. 4558. Fourth Dist., Div. Two. Jan. 21, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LOUIS ROWE, Defendant and Appellant.

**COUNSEL**

John Schessler, under appointment by the Court of Appeal, Schessler & Tribbey and Walter Tribbey for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci and Alan Hager, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KERRIGAN, J.—Convicted by jury of first degree murder (Pen. Code, § 187), defendant waived his right to a jury trial on the penalty issue. The court fixed the penalty and sentenced the defendant to life imprisonment.

Stated succinctly, the crucial issue on appeal is whether the defendant's multiple confessions were properly admitted in evidence.

Richard Kimball, the owner of Richie's Pancake House in San Bernardino, was shot to death about 4 a.m. on December 19, 1969. His body was found shortly thereafter in the dining area of the restaurant by a male cook. An abandoned metal cash box containing check stubs and order blanks was found later in the day on a hill in the rear of the premises.

Kimball had been shot in the left chest, with the gunshot wound being the cause of death (cardiac tamponade). The pathologist also found multiple lacerations on the back of the victim's scalp, such as would be caused by the butt of a pistol, together with bruises and abrasions of the head, apparently emanating from a kick.

Initially, the search for the killer or killers proved fruitless. In May 1970, the police received information that Gary Reticker (aka James Larson), a former employee of the victim, had participated in the killing. Reticker (Larson) was arrested and named the defendant herein, Robert Rowe, as one of the persons involved in the homicide.

The 18-year old defendant was already in custody of the San Bernardino authorities, serving time for a burglary offense. On May 29, 1970, he

was first interrogated about the Kimball homicide. He was interviewed again on June 1, 1970. On June 29, 1970, he participated in a filmed re-enactment of the crime conducted at Richie's Pancake House. On July 20, 1970, he again discussed the Kimball killing with the police. On each of the aforesaid occasions, the defendant confessed to the role he played in Kimball's murder.

The four confessions were obtained under the supervision of San Bernardino Homicide Detective Eugene Allender. The officer rendered the following foundational testimony at trial:

5/29/70. He ordered the defendant transported from the Glen Helen Rehabilitation Center to the San Bernardino Hall of Justice; only he and the defendant were present; he rendered a constitutional advisement; defendant orally waived his constitutional rights and also signed a waiver form; the interview was taped but the tape recorder malfunctioned; however, he made written notes of the interview in narrative form.

6/1/70. He received word that the defendant wanted to talk to him about the Kimball killing and he went to Glen Helen and brought defendant to police headquarters; two other officers were present at this interview; the interview was recorded on tape; defendant indicated that he wanted to make some corrections in his first confession; prior to the commencement of questioning, defendant was given another *Miranda* advisement, verbally waived his constitutional rights, and signed a waiver form.

6/29/70. A filmed re-enactment of the killing was arranged; the defendant volunteered to participate in the film; while he knew that defendant had been arraigned on the murder charge and that the court had appointed counsel to represent the defendant, he did not inform defense counsel that defendant intended to take part in the re-enactment inasmuch as the defendant offered to participate; defendant waived his constitutional rights.

7/20/70. The defendant asked to see him; he complied with the defendant's request; the interrogation was tape-recorded at the Hall of Justice in San Bernardino; only he and the defendant were present; the *Miranda* warnings were repeated; defendant waived his constitutional rights and again indicated he wanted to discuss the Kimball killing.

It is unnecessary to treat the content of each of the four interrogations independently as in each instance the defendant confessed to his part in the tragic shooting of Kimball. Some of the incriminating statements made in confessions 2, 3 and 4 were merely repetitive of those given in preceding interrogations. Some minor inconsistencies also appear in the

four statements, none of which are significant to the issues to be resolved on appeal. Consequently, the following narration is a composite of the defendant's four confessions:

He and some mutual friends met James Larson (Reticker) a few weeks before the homicide and started running around together; Larson was working for Kimball when they first became acquainted; after quitting or being fired, Larson informed the others that Kimball kept large sums of money on his person and in the restaurant; about 3 a.m. the morning of the killing, James Larson, Charles Rowe [defendant's brother], Duwayne Miller, Linda Sommerville [Miller's girlfriend], and he [the defendant] drove to an area known as Perris Hill Park near Richie's Pancake House and parked; the girl stayed in the car and knew nothing about the men's intentions, apparently having passed out in the car; he had a .38-caliber Smith & Wesson revolver in his possession which he had previously stolen; the four males got out of the car; while the other three remained outside the restaurant, he broke a window with the butt-end of the gun, entered the restaurant, took a briefcase and a metal box and left; neither the box nor the briefcase contained any money; they drove around for awhile, disappointed that the burglary had proved fruitless; Larson indicated that Kimball would probably arrive at the restaurant around 3:30-4 a.m.; they drove back to Perris Hill and he and Duwayne Miller proceeded to the restaurant; he still had the gun in his possession; the two gained entry into the office through the broken window; while both were in the office, he handed Miller the .38 revolver and started rummaging through the files; suddenly, they hear a noise in the kitchen; he told Miller that Kimball must have arrived; Miller left the office with the gun; in seconds he heard a shot, ran out and the two fled the scene after Miller had removed Kimball's wallet; after leaving Perris Hill, they threw the briefcase and wallet away; while fleeing the scene in the car, Miller told the others that Kimball had come out of the kitchen and grabbed him by the arm and he shot him; Miller said he hit the victim in the head with the gun several times because Kimball was calling for help or for the police; Miller also said he kicked the victim in the head.

In confessions No. 2 and No. 4, defendant admitted complicity in prior burglaries; association with an individual involved in illegal firearm and explosive sales; the sale of stolen property in exchange for narcotics; automobile theft; and association with one "Chico" who was selling "truck-loads" of guns to the Black Panthers. These admissions of other crimes and criminal associations were heard by the jury when the defendant's confessions were played, but on the prosecution's motion, the admissions were stricken and the court admonished the jury to disregard the same.

In the filmed re-enactment of the crime, both Miller and defendant participated, depicting their actions from the time they entered the restaurant until they fled the scene. The dialogue took the following form while both men were in the office of the restaurant: Defendant told Miller they were going to rob Kimball when he came in; Miller stated that was the first he had heard of the intended robbery; defendant stated that after gaining entrance through the rear broken window, he handed the .38 Smith & Wesson revolver to Miller and started going through the desk; Miller stated he took the gun while defendant ransacked the victim's desk; defendant found a key in the desk and unlocked a filing cabinet, while both of them were in the office, defendant heard a noise in the kitchen; defendant told Miller ". . . to go and get him . . ."; Miller left the room; within moments, defendant heard a shot and he fled the scene.

The filmed re-enactment thereafter showed Miller in the dining area of the restaurant. A police officer simulated Kimball. Miller said after he entered the dining room, the victim saw him through the kitchen door, came in, grabbed him, and the gun went off; Kimball fell to the floor; Kimball tried to get up and yelled, "Call the cops!"; Miller then kicked him in the head; when the victim continued screaming or yelling, Miller said he hit him across the head with the butt of the gun about three times; Miller then took the victim's wallet and both men left by a side door. (The victim died within a minute after their departure.)

The prosecution only called seven witnesses in this case.[1] Allender was the chief prosecution witness. Stated categorically, the parol confessions and the film confession represented the prosecution's only significant evidence on the issue of guilt.

All the foundational evidence and circumstances relating to the four confessions were introduced in the presence of the jury. While defense counsel did not request an *in camera* session, he objected to the admission of all four confessions on the ground that the confessions were involuntary. While defense counsel was permitted to *voir dire* Detective Allender briefly as to confessions No. 1 and No. 4, his offer to call defense witnesses for the purpose of attacking the voluntariness of the confessions was refused, the trial judge making the comment that the defendant would have an opportunity to present the issue after the prosecution rested its case-in-chief. However, the confessions were admitted in evidence before the defense put on any evidence.

---

[1]Detective Allender. The officer who found the discarded cash box. The cook who found the body. The pathologist. An officer who assisted Allender in the investigation. The officer who responded to the cook's call following discovery of the body. The victim's mother.

The defendant's mother testified to the effect that she had a conversation with Detective Allender in early June 1970, in which he stated that if the defendant cooperated with the officer ". . . by turning state evidence, he would probably be granted leniency."

The defendant took the stand and his testimony may be capsulized by stating that on the night of the killing he suffered from diminished capacity by reason of an excessive intake of alcohol and drugs. However, through inadvertence of defense counsel, defendant did not render any testimony on the issue of voluntariness of the confessions. When the defense had rested its case and before argument commenced or instructions were given, defense counsel remembered the oversight and made a motion to reopen the defense for the purpose of putting on evidence as to the voluntariness issue. The court denied the motion.

 Defendant maintains: (1) The admission in evidence of the four confessions, without according him the right to fully cross-examine Detective Allender on the voluntariness issue, and without according him the right to present evidence that he was induced to make the confessions based on the promise of leniency, violated his right to due process of law; (2) the court's refusal to permit the defense to reopen its case for the limited purpose of offering evidence of leniency constituted error; (3) the jury was permitted to hear irrelevant, highly prejudicial evidence of defendant's participation in other crimes, and the effect thereof was not cured by the prosecution's motion to strike such testimony or the court's admonition to disregard it; and (4) confessions No. 3 (filmed confession) and No. 4 were erroneously admitted in evidence as both occurred after counsel had been appointed and without notice to counsel.

Focusing initially on the issue as to whether the trial court accorded the defendant a fair hearing before admitting his extrajudicial statements in evidence, it should be noted that the voluntary nature of a criminal confession is a "preliminary fact" which must be determined by the trial judge before he can submit evidence of the confession to the jury (Evid. Code, §§ 402, 405), and that the hearing to determine the admissibility of the confession shall be conducted by the court outside the presence of the jury, *if any party so requests*. (Evid. Code, § 402, subd. (b).) The judge's determination must be reflected in the record with unmistakable clarity although he need not make formal written findings. (*Sims* v. *State of Georgia*, 385 U.S. 538, 544 [17 L.Ed.2d 593, 598, 87 S.Ct. 639, 643].) Since section 405 of the Evidence Code gives the trial judge full and final responsibility for determining whether a confession is voluntary, the jury

is not instructed on that issue. (See *People* v. *Burton,** 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], holding that this procedure is constitutional and not a deprivation of the defendant's right to trial by jury.)

While no request was made herein for an *in camera* session, it is a matter of common knowledge in the legal profession that in all instances where the defendant objects to the admission of a confession that the court, whether requested or not, should conduct the hearing outside the presence of the jury, the painfully obvious reason being that in the event the hearing is held in the jury's presence and the court finds the confession to be involuntary, the court would undoubtedly be confronted with a motion for mistrial or a claim of prejudicial error on appeal. While there may be circumstances where a defendant would want his hearing in the presence of the jury, the best rule for the trial court to follow in general is that the hearing should be private.

Not only is the defendant objecting to the admission of a confession entitled to a hearing, it must be a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined. (*Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *Sims* v. *State of Georgia, supra,* 385 U.S. 538.) ▮ The prosecution must lay the foundation for the introduction of the confession by preliminary proof establishing that it was freely and voluntarily made. (*People* v. *Underwood,* 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]; *People* v. *Trout,* 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve,* 51 Cal.2d 286, 291 [332 P.2d 97].)

It has long been established that once the state has laid a foundation for the introduction of a confession and has made a prima facie showing that it was freely and voluntarily made, it is absolutely incumbent upon the court to permit the defendant an opportunity to overcome the prima facie showing of voluntariness. (*People* v. *Gonzales,*[2] 24 Cal.2d 870, 876 [151 P.2d 251]; *People* v. *Padden,* 238 Cal.App.2d 708, 713 [48 Cal. Rptr. 311]; *People* v. *Rice,* 16 Cal.App.3d 337, 343-344 [94 Cal.Rptr. 4]; *People* v. *Schindler,* 179 Cal.App.2d 584, 588-590 [3 Cal.Rptr. 865].)

In *People* v. *Schindler, supra,* 179 Cal.App.2d 584, defendants objected to the admission in evidence of a confession on the ground that the con-

---

*Supreme Court Action No. CR. 15823, decided Dec. 28, 1971; no petition for rehearing filed.

[2]A related point in the *Gonzales* holding—that the issue of voluntariness is to be determined ultimately by the jury—has been changed by Evidence Code, section 405. See discussion *supra.*

fession was involuntary. The trial court allowed defendants an opportunity to cross-examine the prosecution's witness on *voir dire* before admitting evidence of the confession, but refused defendants' request to call witnesses in their own behalf. As was done in the case under review, the *Schindler* judge told the defendants they would have to wait until the prosecution had rested its case—this is, until after the confessions had been introduced—before defendants could call their own witnesses on the question of voluntariness. The reviewing court held this procedure to be prejudicial error, citing *People* v. *Gonzales, supra*, 24 Cal.2d 870.

■ The defense in this case made it clear to the trial court that its repeated objections to the admission of the four confessions were based on a promise of leniency, However, the trial court adamantly refused to permit the defense to offer evidence on the claim of leniency and admitted the confessions in evidence before any opportunity was afforded the defense to prove its claim.[3]

■ A confession obtained as a result of a promise of leniency is involuntary (*People* v. *Quinn*, 61 Cal.2d 551, 554 [39 Cal.Rptr. 393, 393 P.2d 705]), and if it is the motivating cause of the confession, such a confession is inadmissible as a matter of law. (*People* v. *Brommel*, 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].)

The Attorney General's reliance on the case of *Procunier* v. *Atchley*, 400 U.S. 446 [27 L.Ed.2d 524, 91 S.Ct. 485], is misplaced. In *Procunier*, the defendant had alleged a set of facts which, even if believed, would be insufficient grounds for holding that his confession was involuntary. The Supreme Court held that in that situation, it would be futile for the trial court to hold a rehearing on the voluntary issue. But in the case under review, the defendant alleged at trial and on appeal facts which, if believed, would compel exclusion of his confessions.

■ Consequently, the trial judge in this case must be deemed to have committed grave error in refusing to permit the defense to rebut the prosecution's prima facie showing of voluntariness. ■ The improper admission in evidence of a confession to murder in the first degree is prejudicial per se. (*People* v. *Schader*, 62 Cal.2d 716, 728-729 [44 Cal.Rptr. 193, 401 P.2d 665].) The rationale for the rule requiring automatic reversal is that a confession constitutes devastating evidence of guilt. (*People* v. *Parham*, 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001].)

---

[3]While the defendant's mother was belatedly allowed to testify for the defense to the effect that a promise of leniency had been made, the confessions had already been admitted in evidence.

In view of the foregoing discussion, it is unnecessary to reach the defendant's second contention that the trial court abused its discretion in not permitting him to reopen the defense for the purpose of putting on evidence relative to the leniency claim. At that time incurable error had already been committed.

Inasmuch as we are compelled to reverse the judgment of conviction because of the serious error committed in failing to hold a fair hearing, a lengthy discussion of defendant's remaining contentions is unnecessary. However, because a retrial will ensue, we will briefly treat the remaining issues raised by the defendant for the trial court's guidance upon retrial.

Defendant claims that his third and fourth confessions were involuntary because said statements were obtained after an attorney had been appointed to represent him and were made without notice to, or presence of, his counsel. (See *People* v. *Isby,* 267 Cal.App.2d 484, 494 [73 Cal.Rptr. 294]; *People* v. *Valencia,* 267 Cal.App.2d 620, 627 [73 Cal.Rptr. 303]; *Tidwell* v. *Superior Court,* 17 Cal.App.3d 780, 789 [95 Cal.Rptr. 213].) *Isby* held that once a criminal charge has been filed against an accused and counsel has been appointed or retained, the defendant may not be subjected to an interrogation instigated by law enforcement officers for the purpose of eliciting incriminatory statements without assistance of counsel. (*People* v. *Isby, supra,* 267 Cal.App.2d 484, 494.) However, the *Isby* rule was never intended to preclude interrogation of a defendant who initiated the interrogation himself. (See *People* v. *Arauz,* 5 Cal. App.3d 523, 531 [85 Cal.Rptr. 266].) We make no determination on this appeal as to who instigated the last confession and filmed re-enactment; consequently, the admission of such evidence will depend on the preliminary facts adduced at the retrial hearing.

The defendant's contention that his third confession should have been edited to omit any reference to unrelated crimes and criminal associations is well-taken. Upon retrial such admissions should be excised from the recording. (See *People* v. *Sam,* 71 Cal.2d 194, 203-206 [77 Cal.Rptr. 804, 454 P.2d 700].)

The judgment of conviction is reversed.

Kaufman, Acting P. J., and Gabbert, J., concurred.

A petition for a rehearing was denied February 8, 1972.