[No. F002421. Fifth Dist. May 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD W. DICKSON, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exceptions of parts II, III, VI and VII.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Mark L. Christiansen, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas Y. Shigemoto and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### FRANSON, Acting P. J.—

#### STATEMENT OF THE CASE

Appellant was charged by information as follows: count one—the murder of Ida Marie Husler in violation of Penal Code section 187, with two special circumstances allegations of robbery-murder and burglary-murder under Penal Code section 190.2, subdivision (a)(17); count two—robbery of Ida Marie Husler in violation of Penal Code section 211; count three—burglary of Spanky's restaurant (where Ida Husler was murdered) in violation of Penal Code section 459; count four—attempted rape of Ida Marie Husler in violation of Penal Code sections 664 and 261, subdivision (2); count five—robbery of Karen B. in violation of Penal Code section 211; count six—kidnaping in violation of Penal Code section 207; count seven—rape of Karen B. in violation of Penal Code section 261, subdivision (2); and count eight—forced oral copulation of Karen B. in violation of Penal Code section 288a, subdivision (c).

As to counts one, two, three, five and six, it was further alleged that appellant personally used a handgun during the commission of the crimes within the meaning of Penal Code section 12022.5. As to counts four, seven and eight, it was further alleged that during the commission of the sex offenses appellant personally used a handgun within the meaning of Penal Code section 12022.3, subdivision (a). Appellant pleaded not guilty to all counts.

Appellant filed motions to suppress evidence under Penal Code section 1538.5. The motions related to a statement appellant gave to the police and to evidence seized pursuant to a search warrant. Appellant also filed a Penal Code section 995 motion to dismiss count four and a motion to sever counts one through four from counts five through eight. The respective motions were denied.

Thereafter, the jury returned verdicts of guilty on all counts, and all of the firearm use enhancements were found true. As to count one, it was murder in the first degree and the robbery-murder and burglary-murder special circumstances were found true.

Appellant's motion for a new trial was denied.

Appellant was sentenced to state prison for life without the possibility of parole on count one with two years consecutive thereto for the use of a firearm. He was sentenced on count seven to state prison for the upper term of eight years plus three additional years for the use of a firearm; the sentence on count one was consecutive to the sentence on count seven. The sentences on counts four, five and eight were to run concurrent to the sentences on count seven. Sentences on counts two, three and six were stayed. Appellant received total credits (as to the determinate sentences) of 454 days.

### STATEMENT OF THE FACTS

This case involves two incidents. First, in the evening of June 3, 1982, Ida Marie Husler was murdered at "Spanky's," a restaurant she co-owned. She was found dead, shot in the back, with her pants down around her knees. A trail of blood showed that she was shot in the front of the restaurant near the cash register and died as she tried to call for help on the telephone in the backroom. The telephone was off the hook. Money from the cash register was gone, and a .32 caliber shell casing was on the floor.

The second incident was the armed robbery of a 7-Eleven and the kidnaping, oral copulation and rape of the cashier, Karen B. On June 21, 1982,

Karen was working alone in the 7-Eleven at West and Shaw. Appellant came in, asked for a pack of cigarettes, then pulled a gun and demanded all of the money in the cash drawer. After taking the money, he discovered a surveillance camera in the store. Appellant made Karen help him remove the surveillance camera. He put Karen and the camera in his truck.

Appellant then took Karen to a remote area, ordered her to disrobe, forced her to orally copulate him and raped her. Afterward, he threatened to bomb her house if she told the police he was black and released her. The next day, she and her boyfriend saw him driving his truck and turned the license number over to police. The surveillance camera was recovered from his apartment, and the photographs it contained show appellant holding a gun on Karen B. in the 7-Eleven.

Appellant admits robbing the 7-Eleven, but denied the other charges. He claims that someone named "Robert Smith" was with him when he robbed the 7-Eleven, that Smith kidnaped Karen over appellant's objection and that he (appellant) jumped out of the truck and walked home. Karen testified that appellant was alone when he robbed and raped her. Sperm found in her body may have come from appellant, and footprints found at the scene of the rape matched his shoes.

Appellant's gun was shown to be the murder weapon in the "Spanky's" robbery-murder. A witness testified that appellant's truck was parked nearby at the time, and other witnesses testified that appellant came to the scene later and asked restaurant employees about the murder and about the progress of the investigation. Appellant also quizzed one of his neighbors, a policeman, about the investigation's progress. Appellant's defense was alibi, substantiated by relatives. He also claimed that he bought the murder weapon on June 5th or 6th, after the murder had occurred.

While appellant was in jail, and after defense counsel was appointed, appellant made several requests to speak to the police. Appellant had read the police reports and knew that the 7-Eleven surveillance camera had been recovered from his apartment and that the film showed him holding a gun on Karen in the store. Officer Jones, who received appellant's request from the jail, first called appellant's counsel, Gerald Kahl. Mr. Kahl did not want the police to take appellant's statement, but after another written request was received from appellant and Mr. Kahl did not respond to phone calls about the request, appellant was allowed to make a statement.

This interview was taped. It included a complete *Miranda*[1] advisement and other questions to establish that it was being done at appellant's request,

---

[1] *Miranda* v. *Arizona* (1965) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

free of coercion, that he knew he had counsel, knew that counsel was opposed to his desire to talk and chose to go ahead anyway.

Appellant's motion to suppress the tape was denied, and the tape was used at trial. The prosecution relied on parts of the tape to pin down the date when appellant purchased the murder weapon. On the tape, he claims that a woman (Sherry Nelson) went with him to buy the gun and would remember the date. Her preliminary hearing testimony set the date in mid-May, but at the trial she claimed it was in June. Her preliminary hearing testimony was admitted as a prior inconsistent statement.

Part of appellant's defense to the murder charge was his claim that he bought the murder weapon from Skip Johnson on June 5th or 6th, three days after the murder was committed. Appellant's counsel sought judicial "use immunity" to encourage Johnson to testify, but it was denied, and when called as a witness, Johnson asserted the Fifth Amendment. Johnson admitted, out of court, that he had been asked to commit perjury on appellant's behalf for $1,000 but that he had not been paid. Appellant sought to introduce statements Johnson made out of court to defense counsel and investigators that he sold the gun to appellant on June 5th or 6th. The court found Johnson was unavailable as a witness under Evidence Code section 1230, but ruled that Johnson's statements were inadmissible because there was no evidence that Johnson knew the statements were against his penal interest when they were made and that his statements were untrustworthy.

DISCUSSION

I.

*The use of appellant's statement to police did not violate his Sixth Amendment right to counsel.*

Upon his arrest on June 23, 1982, appellant invoked his Fifth Amendment right not to talk to the police, and defense counsel was appointed. But while in jail, he sent several messages to Officer Jones of the Fresno Police Department, who was investigating the murder of Ms. Husler. Officer Jones knew that appellant was represented by Deputy Public Defender Gerald Kahl. After receiving written messages and verbal messages via appellant's wife Annazette and his father-in-law Bemore Shillings, Officer Jones contacted Mr. Kahl and told him about the messages. Mr. Kahl said that he did not want the officer to talk to appellant at that time. Officer Jones did not talk to appellant at that time, but continued to receive messages through Annazette and Bemore Shillings. Finally, around July 30, Officer Jones received another signed, written message from appellant. Appellant asked

to talk to Officer Jones even though Officer Jones had rejected his earlier requests. Officer Jones left messages at Mr. Kahl's office to contact him about appellant's continuing requests, but did not receive a response.

Officer Jones then had appellant brought to police headquarters and took a taped statement. Before the interview started, Officer Jones read appellant his rights from a *Miranda* card, reminded him that his attorney did not want him to talk to the police and stated that he was willing to go along with the attorney and not talk to appellant. Appellant told Officer Jones that he knew who his lawyer was and correctly told him Mr. Kahl's name. He also claimed to have "a private lawyer too." Officer Jones then reminded appellant that Mr. Kahl did not want them to talk and stated that he (Officer Jones) would abide by Mr. Kahl's wishes. After Jones made a point of telling appellant that he did not want to coerce him into talking, appellant claimed that he had told his attorney that he was going to talk, and "he just told me you don't sign no papers. But I'll talk to you. That's no problem." This led Officer Jones to believe that appellant had informed his lawyer of his plan to talk to the police.

Appellant then proceeded to admit to the 7-Eleven robbery, but to deny responsibility for the kidnaping and rape of Karen B. and to deny all knowledge of Ms. Husler's murder. He claimed that Robert Smith talked him into the 7-Eleven robbery, kidnaped Karen B. and commited the sexual offenses against her. He claimed he had never been to Spanky's and had bought the gun on the 5th or 6th of June from Skip Johnson and pinned down the date by referring to Sherry Nelson's memory of the date.

■   Appellant now makes an extended argument that this taped statement was obtained in violation of his Sixth Amendment right to counsel. He argues that the trial court erroneously applied Fifth Amendment standards to a Sixth Amendment issue and that Sixth Amendment standards are more stringent and were not satisfied, even when appellant requested further interrogation.

Although appellant presents abundant authority for the proposition that the Sixth Amendment compels exclusion of statements elicited from a charged defendant in *government initiated* interrogation in the absence of counsel, no authority is cited for the crucial proposition—that a defendant's repeated, independently motivated requests for an opportunity to speak to police investigators must be ignored because the defendant has counsel even when the defendant knows that his counsel is opposed to his speaking to the officers and chooses to ignore counsel's advice.

None of the cases cited by appellant have involved this type of clear choice by the defendant contrary to his attorney's advice. In *Massiah* v.

*United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], the defendant's statements were taken surreptitiously when he thought he was speaking confidentially to a confederate. In *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232], the defendant spoke out against the advice of counsel, but was reacting to a police officer's "Christian burial speech"—designed to play on his emotions. Appellant has not pointed out anything surreptitious or psychologically coercive in the police conduct here. The officers only complied with appellant's repeated requests to talk to them.

The majority opinion in *Wyrick* v. *Fields* (1982) 459 U.S. 42 [74 L.Ed.2d 214, 103 S.Ct. 394] does not touch on Sixth Amendment issues but approves an interrogation following a defendant's requested polygraph examination. In a Fifth Amendment context, the *Wyrick* court states that when a suspect has initiated the dialogue, the right to have a lawyer present can be waived. (*Id.*, at p. 46 [74 L.Ed.2d at pp. 217-218].) Even Justice Marshall's dissent, quoted at length by appellant, allows a state to establish a waiver of the Sixth Amendment right to counsel by proving " ' "an intentional relinquishment or abandonment" ' " of the right to have counsel present." (*Id.*, at p. 54 [74 L.Ed.2d at p. 223], quoting *Brewer* v. *Williams, supra,* 430 U.S. at p. 404 [51 L.Ed.2d at p. 439], quoting *Johnson* v. *Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357].) Here, where appellant was pointedly advised that his own counsel did not want him to talk and he went ahead anyway, it is clear that he intentionally "relinquished and abandoned" his right to have counsel present. In this context, this case is much like *Wyrick* v. *Fields, supra,* 459 U.S. 42 where, on remand to the Eighth Circuit, the Sixth Amendment issues raised in Justice Marshall's dissent were decided. The defendant's request to have a polygraph examination without counsel after he was advised of his right to have counsel present was deemed a voluntary and intentional relinquishment of his Sixth Amendment right to have counsel present at postarrest questioning. (*Fields* v. *Wyrick* (8th Cir. 1983) 706 F.2d 879, 881-882, cert. den. *Fields* v. *Wyrick* (1983) 464 U.S. 1020 [78 L.Ed.2d 728, 104 S.Ct. 556].)

█ Appellant contends that two *per curiam* decisions, *McLeod* v. *Ohio* (1965) 381 U.S. 356 [14 L.Ed.2d 682, 85 S.Ct. 1556] and *Beatty* v. *United States* (1967) 389 U.S. 45 [19 L.Ed.2d 48, 88 S.Ct. 234] citing *Massiah* v. *United States, supra,* 377 U.S. 201, are evidence of the Supreme Court's intent to construe *Massiah* in broad terms to exclude "all incriminating statements" obtained in the absence of counsel. But one only needs to look at the lower court decisions to see that these *per curiam* reversals are irrelevant to our case. In *State* v. *McLeod* (1964) 1 Ohio St. 2d 60 [203 N.E.2d 349], the incriminating statements were obtained before counsel was appointed and apparently *before* the defendant had been advised of his right

to counsel (see dis. opn. per Gibson, J., 203 N.E.2d at pp. 352-353). In *Beatty* v. *United States* (5th Cir. 1967) 377 F.2d 181, the statements were made to a secret informer—as in *Massiah, supra,* 377 U.S. 201—not to a known investigating officer in the police station at the defendant's request.

*Milton* v. *Wainright* (1972) 407 U.S. 371 [33 L.Ed.2d 1, 92 S.Ct. 2174] involved a police infiltrator in a prison—much like *Massiah*—but the Supreme Court found any error harmless and affirmed without reaching the merits. The dissent, relied on by appellant, argues that *Massiah* v. *United States, supra,* 377 U.S. 201 was no new departure, but only an application of *Powell* v. *Alabama* (1932) 287 U.S. 45 [77 L.Ed.2d 158, 53 S.Ct. 55, 84 A.L.R. 527]. Neither this dissent, nor its reading of *Powell* v. *Alabama,* can help appellant. They define the scope of a right to counsel in pretrial stages of a prosecution. Appellant had counsel, was advised not to talk to police, was reminded of this advice by the police and insisted on making the statement in question. It is clear from the tape that appellant thought he could outsmart the authorities by admitting the crime they had pictures of and denying the rest. In hindsight, this was a mistake, but was not necessarily unintelligent, uninformed, involuntary or coerced.

The Supreme Court in *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] held that an accused should not be questioned after invoking his right to counsel unless the accused himself initiates "further communication exchanges, or conversations with the police." (*Id.,* at pp. 484-485 [68 L.Ed.2d at p. 386].) Appellant's repeated requests to speak with Officer Jones in the present case could not be a clearer attempt to reinitiate communication. The police had informed defense counsel of appellant's attempts to make a statement, said they were willing to comply with counsel's wishes and only took the statement after appellant's requests were repeated.

■ California cases applying *Massiah* do not clearly dispose of the issue. Most of them involve statements "elicited" by the police, and those most similar to the case at hand decide the admissibility of volunteered statements in a *Miranda*/Fifth Amendment "voluntariness" context. The leading case is *People* v. *Isby* (1968) 267 Cal.App.2d 484 [73 Cal.Rptr. 294]. There, a police initiated interrogation of the defendant after counsel was appointed was disapproved even though the defendant had signed a waiver and advice of rights form. (*Id.,* at pp. 486, 490-495.) The *Isby* court phrased the *Massiah* rule as creating a *nonwaivable* Sixth Amendment right to counsel after criminal proceedings have commenced (*id.,* at p. 490), but did not explicitly deal with a situation where the defendant *asks* to make a statement or be interrogated. The *Isby* court held that after criminal charges have been filed and defendant has counsel, "he may not be subjected to an interrogation

*instigated by* law enforcement officers for the purpose of eliciting incriminating statements without effective aid of his counsel." (*Id.*, at p. 494, italics added.)

Subsequent cases have held the *Isby* rule inapplicable when statements are volunteered to investigating officers. (*Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 701-702 [103 Cal.Rptr. 379]; *People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1032 [99 Cal.Rptr. 816]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 163-164 [132 Cal.Rptr. 265].) None of these cases, however, provides a clear rule that decides this case. In *Griffin,* the closest case on the facts, the defendant had retained counsel, but requested the interview and expressly waived the presence of the attorney. (*Griffin* v. *Superior Court, supra,* 26 Cal.App.3d at p. 700.) Admission of incriminating statements made at the ensuing interrogation was approved by the *Griffin* court, and *People* v. *Isby, supra,* 267 Cal.App.2d 484, was mentioned, but the analysis is in terms of Fifth Amendment voluntariness issues and depends on a case, *People* v. *Garner* (1961) 57 Cal.2d 135 [18 Cal.Rptr. 40, 367 P.2d 680], that predates both *Miranda* and *Massiah* and only considers the "voluntariness" of the confession involved in a due process context. While *Garner* has been superseded in some respects, it does base its voluntariness analysis on the defendant's solicitation of police. But the voluntariness of a confession is not really the issue in a Sixth Amendment right to counsel case. The confessions or admissions excluded in *Massiah* v. *United States, supra,* 377 U.S. 201 and *Brewer* v. *Williams, supra,* 430 U.S. 387, were both, in a sense, "voluntary," but were instigated or elicited through police action. The voluntariness at issue here is that of the defendant's waiver of his right to have counsel present at interrogation, not the voluntariness of various statements made.[2]

In *People* v. *Rowe, supra,* 22 Cal.App.3d 1023, 1032, the defendant's claim was that absence of counsel at interrogation made his confessions involuntary, conflating Fifth and Sixth Amendment issues. (*Id.*, at p. 1032.) As retrial guidance, the *Rowe* court held that *People* v. *Isby, supra,* 267 Cal.App.2d 484 does not apply when the defendant initiates the interrogation himself, citing *People* v. *Arauz* (1970) 5 Cal.App.3d 523 [85 Cal.Rptr. 266]. *Arauz,* however, involved "blurted" statements to the defendant's parole officer when there was no evidence that the officer had attempted to interrogate him about the pending charges.

---

[2]Regardless of their lack of explicit Sixth Amendment analysis, *Garner* and *Griffin* have been construed as carving out an exception to *Massiah* and *Isby* for situations where the defendant solicits or initiates interrogation in the absence of counsel. (*In re Michael B.* (1981) 125 Cal.App.3d 790, 797 [178 Cal.Rptr. 291]; see also *People* v. *Booker* (1977) 69 Cal.App.3d 654 [138 Cal.Rptr. 347].) This is only dicta, however, since interrogation of Michael B. was initiated by the authorities and *Booker* turns on the fact that counsel had been appointed for distinct charges.)

Finally, *People* v. *Manson, supra,* 61 Cal.App.3d 102 is not on point. There, the prosecutor apparently had a private interview with Manson without defense counsel's consent, but there was no attempt to use statements made in the interview as evidence, so our problem was not confronted. There is dicta to the effect that interrogation instigated by the accused may be proper outside counsel's presence if there has been a specific waiver. (*Id.,* at p. 164.) But there is also dicta pointing out that the prosecutor might have violated professional canons of ethics by directly dealing with an adverse party. (*Ibid.*) The latter is irrelevant to our case. Violation of a professional canon is not necessarily of constitutional dimension, and in any event, Officer Jones is not bound by standards of the *legal* profession.

▮ We believe there should be a clear exception to the *Isby* rule when the accused, as here, specifically requests an opportunity to speak to the police, is *Mirandized,* is advised that he *has* counsel and that counsel opposes his request to talk and he still chooses to do so. On these facts, the accused must be deemed to have made a voluntary, knowing and intelligent waiver of his right to have counsel present when he talked to the police. (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 488 [68 L.Ed.2d at pp. 388-389], conc. opn. of Burger, C. J., quoting from *Johnson* v. *Zerbst, supra,* 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357].)

▮ This exception does no violence to the principle that a defendant has an absolute right to counsel after proceedings against him have begun. He was given counsel, who gave him proper advice, and he chose not to follow it. The right to receive advice and assistance from counsel is not the right to reject the advice and then avoid the consequences. Counsel has done his or her job and provided everything constitutionally mandated when he or she gives the advice. The accused is not constitutionally compelled to follow counsel's advice; he even has a constitutional right to reject counsel altogether and manage his own defense. While we should vigilantly protect an accused's absolute right to counsel, when he knowingly, voluntarily and presumably intelligently chooses to cast that protection aside and talk to the police we should not stand in the way.

II.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

IV.

*Any Beeman error was harmless.*

▮ *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] clarified California law on accomplice liability and disapproved

---

*See footnote *ante,* page 1047.

CALJIC Nos. 3.00 and 3.01 because they only required proof of knowledge on the part of an accomplice of the criminal purpose of the perpetrator, not proof of intent to aid or encourage in a crime. These instructions were requested by the prosecution and read to the jury in this case. The only possible theory we can discern upon which accomplice instructions could have been given was in relation to the kidnaping, rape and oral copulation of Karen B. following the 7-Eleven robbery.[3] Although Karen testified that appellant acted alone, he claimed that a "Robert Smith" was driving his truck, took the gun after the robbery, made Karen get into the truck and drove away with appellant riding in the back. Appellant also claimed that he jumped out of the truck before any sexual offenses occurred and presumably could not have known that they would occur after he left. He testified that Robert returned the truck, the gun and the store's surveillance camera to appellant's house in the morning. In appellant's version of events, the kidnaping and sex offenses were surprise moves by Robert Smith. Appellant went into the store to buy cigarettes and impulsively robbed it. When he came out, Robert suddenly took the gun and told Karen to get in, and appellant tried to prevent Robert's acts by telling Karen to run and that the gun was not loaded.

If the jury accepted appellant's version of the story and disregarded Karen's testimony that he acted alone, then it could not have found that appellant knew about or aided and abetted Karen's kidnaping, rape and oral copulation. Appellant's testimony, if believed, would lead the jury to conclude that the kidnaping was a surprise to him and that he tried to get the victim to run away, tried to stop Robert Smith from taking her along, tried to get Smith to let her go near her home, left the truck before any sexual assault took place and without any knowledge that one would take place.

Karen's version of events does not involve the accomplice instructions at all, because she testified that appellant committed all the acts personally and acted alone.

Thus, under either version of events, the accomplice instructions simply were inapplicable. If appellant acted alone, they were irrelevant; if he was surprised by and opposed to Robert Smith's choice to kidnap and rape the victim, then he had no "knowledge of the unlawful purpose of the perpetrator" and did his best to prevent these crimes.

---

[3]The prosecution requested CALJIC Nos. 3.00 (4th ed. 1981 rev.) and 3.01 (4th ed. 1980 rev.), but only mentioned them to the jury as an illustration of the strictness of the felony-murder rule applicable to the murder charge. No one explicitly invited the jury to apply these instructions to the kidnaping, rape and oral copulation charges. We do not understand why they were requested or why they were given. Nevertheless, we must assume they had some pertinency to the prosecution's case.

*People* v. *Acero* (1984) 161 Cal.App.3d 217 [208 Cal.Rptr. 565] holds that *Beeman* error is reversible per se but that this rule is subject to the type of exceptions described in *People* v. *Garcia* (1984) 36 Cal.3d 539, 554-557 [205 Cal.Rptr. 265, 684 P.2d 826]. (See also *People* v. *Gilman* (1984) 156 Cal.App.3d 760 [203 Cal.Rptr. 6], hg. den.)

*People* v. *Garcia, supra,* 36 Cal.3d 539 provides a "reversible per se" rule for *Carlos* error. *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], like *People* v. *Beeman, supra,* 35 Cal.3d 547 involves a failure to instruct on a specific intent element of a crime. The two types of error are quite similar and should be governed by similar standards of prejudice. (See *People* v. *Garcia, supra,* 36 Cal.3d at p. 554, fn. 9, comparing *Carlos* to *Beeman.*)

*Garcia* describes four exceptions to its per se reversal rule, one of which is where there is no evidence "deserving of any consideration whatsoever" relative to the issue (citing *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267] and *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]). (*People* v. *Garcia, supra,* 36 Cal.3d 539 at pp. 554-556.) As we have explained, there is no evidence deserving of consideration that could have supported a verdict based on the accomplice instructions. The only evidence in the case that could support any conviction on the kidnaping, rape and oral copulation charges did not involve an accomplice at all, so appellant was not possibly harmed by the giving of CALJIC Nos. 3.00 (4th ed. 1981 rev.) and 3.01 (4th ed. 1980 rev.). The court was not required to instruct on "issues and questions not raised by the evidence." (*People* v. *Garcia,·supra,* citing *People* v. *Cantrell, supra,* 8 Cal.3d at p. 685.)

V.

*The conceded Carlos error compels a reversal of the special circumstance finding.*

■   *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131 held that proof of intent to kill or to aid in a killing was essential to a finding of a felony-murder special circumstance under the 1978 death penalty initiative. (Pen. Code, § 190.2, subd. (a)(17).) *People* v. *Garcia, supra,* 36 Cal.3d 539 holds that *Carlos* is retroactive.

Appellant's only defense was one of alibi. He claims he was elsewhere at the time of the murder and did not yet own the murder weapon. The jury obviously rejected this defense. Because this was a pre-*Carlos* case, appellant's intent to kill was not relevant. The only intent relevant to the murder

conviction on a felony-murder theory was the intent to rob or burglarize. Therefore, even if appellant knew that his alibi would be rejected, he had no reason to present evidence that he did not intend to kill. The prosecution had already indicated it was not seeking the death penalty so the intent issue did not come up in the penalty phase.

If *Carlos* had been decided before appellant's trial, he would have been in a very different tactical position. Appellant could still rely on the alibi defense but try to raise doubts about intent to kill from the angle of the shot, the evidence that the victim was left alive to apparently attempt to call for help and other possible theories. Finally, appellant could have abandoned the alibi defense, admitted the robbery and asserted diminished capacity or accidental shooting in the course of the robbery.

Accordingly, the trial court's failure to instruct the jury that it must find an intent to kill as a predicate of the special circumstance finding is prejudicial error. It does not fit within any of the exceptions enumerated in *People* v. *Garcia, supra,* 36 Cal.3d 539, and we see no other available exception. Thus, the special circumstance finding must be reversed for a new trial.

VI.*

. . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed as to the special circumstance finding of life imprisonment without possibility of parole. The judgment is affirmed in all other respects. The People may retry the special circumstance allegation in compliance with *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131.

Woolpert, J., and Best, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 29, 1985.

---

*See footnote *ante,* page 1047.